Panel will hear one argument, Transource v. Defrank, et al, Appellate No. 24-1045. Good morning, Your Honor. Good morning. May it please the Court, my name is Michael Scorenci. I am a Senior Deputy Attorney General with the Pennsylvania Office of Attorney General. I'm here representing the Pennsylvania Public Utility Commission, the PUC, on this appeal. I'm also joined at Council's table by Chris Vandiverg and by Chris Brennan. With your permission, I'd like to reserve three minutes for rebuttal.  The District Court disregarded over a century of historical state regulation over the determination of whether a transmission line is needed. The District Court also disregarded the statements of courts, legal scholars, FERC, most notably in its Order 1000, and now even one of the current FERC commissioners, Mark Christie. All of them have recognized state authority over a needs determination for a transmission line, regardless of whether that line is intra or interstate. Are you talking about a needs determination or a location determination? That's where the District Court made an egregious error in determining that a citing determination is limited to where. As FERC said in its Order 1000 and 1000A, most notably, citing is what needs to be built, where needs it to be built, and who builds it. Where does citing go to need? Because it seems to be two very different things. One is the line. I'll call it a line. I don't know how they run the ohms or whatever it is to the cables. But one issue is whether or not it is necessary. If it's not necessary, that's the end of the inquiry. But if it is necessary, you've got to figure out where do you put it. And it seems to me, traditionally, historically, that's the role of the state. No, the state's role historically, and this goes back to the advent of electricity, is to determine whether the line is needed at all. But things have changed since the advent of Electricity Council, right? I mean, the whole point of FERC, the whole point of Federal Power Act, the whole point of endless congressional intervention in this area is to create a multistate market for the transmission of energy in a reasonable and just way. Right, so account for that change. I think we need to move into the more modern legislation, right? Well, the state statutes have not changed since the Federal Power Act. Sure, but that doesn't help you, right? I mean, the fact that the state hasn't changed its law to accommodate the federal law doesn't answer the question of preemption that we need. It does help us because when FERC wrote its Order 1000 and 1008, it understood the citing process. It understood that states traditionally make a determination of whether the line is needed at all. That's why when it made the distinction in its Order 1000 between regional transmission planning and citing, it said regional transmission planning is a process. That process is designed to evaluate and identify transition system needs and potential solutions to those needs. Counsel, I'd like you to answer Judgment Key's question about need, though. FERC decided it was necessary to reduce congestion. The state, through the PUC-DALJ, decided it wasn't necessary. What is their authority to decide and override FERC's conclusion that it was necessary to deal with interstate transmission of the electricity? Because those two determinations are made in different contexts and for different purposes. That's what's pivotal for- Let's break it down. Yes. What was it decided for for the purposes of the PUC versus what was it decided for for FERC? First, it was made by PJM with approval from FERC. But that determination-  For my purposes, we're going to call it FERC for now. Okay. Very well. That was made in the context of regional transmission planning. Regional transmission planning is different than citing, and FERC made this clear in Order 1000 and 1008. What's citing? Citing is determining, as FERC said, what needs to be built, where it needs to be built, and who it needs to be built. What relates to the- That's for the entire transmission project? That- yeah. So the PUC gets to determine whether or not the transmission- I'm sorry. Can you say that again? The PUC gets to determine whether the entire transmission project is necessary, not just as a matter of Pennsylvania interest, but for the entire- No. The PUC only has authority within Pennsylvania, but they do consider regional needs as they're required by Section 2805 of state law. Presumably, every state can enact this power and make that determination. That's right, although FERC- How will anything ever get built then? I guess I'd just sort of- That's my question. Yeah. How do you build anything? Because every state is going to do what happened here and say, well, it's in the interest of the citizens of West Virginia to not build this. It's always in the interest of the citizens of New Jersey to not build it. But meanwhile, the region as a whole suffers, and you get exactly the problem you have here, where one state's consumers are advantaged by congestion, and the other- most of the consumers in the region are disadvantaged. So if you leave that up to the state determination and bring that all into a determination of site, nothing happens. It's a mess. Respectfully, Your Honor, that's a decision that Congress has made. This is a policy question, and Congress, of course, could usurp the authority, preempt the authority of the states to make that determination. Didn't they do that, though, through the Federal Power Act? They haven't done it yet. They've only allowed for limited backstop siting with respect to Federal Power Act Section 216. Yeah, well, we're not in 216 land, right? Yeah, of course. We're not in 216 land, so we- and I know that Yannick has talked about it. We're really not there here. We're not. What we're faced here, though, with is exactly what my two colleagues are asking you about. FERC made a decision that there should be regional consideration. The PUC's decision was, that's fine, but it hurts us too much, our citizens, so we're not going to accede to that, and we're going to say there's- the need isn't justified. You haven't really explained to Judge McKee or me what the need is. But really, going back to Judge Meadey's and Judge McKee's question, the position that the PUC is asking us to adopt is even if FERC says there's regional congestion, and that is affecting the overall grid for the area, if a particular state authority says it's going to hurt our instators, so no grid of- we're not going to advance the grid in that way, that means that every state would be able to disrupt the regional transmission role that FERC was ordered by Congress to play. Correct? No, it wouldn't, because this is exactly what Congress envisioned, and that's what FERC recognized in Order 1000 and 1000A, that PJM and regional transmission organizations would make the initial screening determination about whether a transmission line is needed for purposes of regional planning. But regional planning is a process. This process evaluates and identifies regional transmission needs that ultimately results in a single regional transmission plan. That's the purpose behind regional planning, is to create a single regional transmission plan. And I think what crystallizes the difference between the process of regional planning and the substantive decision in siting is to consider what transmission planning was like before FERC Orders 890 and 1000. Before those orders, transmission planning was an inefficient, ineffective, chaotic, and balkanized process whereby each individual transmission owner was only planning for its own commercial interests. If you elevate that from the owner to the state, it seems to me that's exactly what you have now. By interpreting what siting means as broadly as you are, you're taking the problem which did exist in terms of the individual transmission to owners, and you're placing that problem in the hands of the state. So looking at the needs of the region, I think you'd agree that there's a tendency, kind of an inertia for each component of the region, each state in that region, to look at it through a lens that jaundiced its vision against non-state residents, and that's what happened here. If state acts as consumers are advantaged by a situation which disadvantages everybody else in the region, why would we assume that state acts would be so incredibly beneficent as to say, well, we have to do something here which is going to penalize our citizens, i.e., our taxpayers, our voters, but it's going to be for the general good, so we're going to say that the power line goes through. That can't be what siting means. Yes, siting means whether the line is needed, and, Your Honors, for purposes of conflict preemption, we have to look at whether the state law or the state decision here is an obstacle to the accomplishment and execution of Congress's full purposes. That's why I'm emphasizing so much here the different purposes behind regional transmission planning and siting. The two things are different. Once the regional transmission expansion plan was created by PJM, that's the accomplishment of regional transmission planning was accomplished. That is a much more cost-effective and cost-efficient process than, as I was saying before, what happened before there was no regional transmission planning. You had different, like PICO and PPL, proposing their own commercial interests, and that's not always a good thing when they don't have the big picture. Why is this such a novel set of circumstances? Because we don't seem to find in your arguments endless examples of PUCs defining siting in the way that you have done and courts approving that interpretation under federal law. So what do you think accounts for that? I think traditionally the states and the federal government have understood the two roles of the states and the federal government here. I pointed to cases from 1967 in Florida, in 1984 in Mississippi, in 2009 in Arizona. All of these states denied siting applications that involved interstate transmission lines because they would not benefit their citizens. Yeah, but I don't think the issue presented in those cases is what's been presented here. I think that it wasn't challenged because everyone recognized the different roles between state commissions. I don't know that we know that. I agree with Judge Mady. I don't know that we know that. I think it's not only that, but if you look also at cases like Piedmont, have recognized that part of the state's normal work is to look at benefits and costs. But if you want to look at cases and look at Mississippi Power, look at Appalachian Power, were both those cases that said the state cannot do a prudence inquiry, which is akin to what happened here. But Mississippi Power, Your Honor, that was a case where FERC had issued a specific order on that issue. Here FERC has recognized over and over again, in Orders 1000 and 1000A, that siting and transmission planning are different. Even one of FERC's own commissioners has recognized, called out this decision for upending the proper balance of state and federal power. Counsel, what issue did this commissioner call out, the one in our case? He called out this very case. It's cited in my brief. He's written, I think, ten decisions criticizing the district court's decision here, saying while FERC regulates regional transmission organizations and independent system operators such as PJM, in no way does that regulatory oversight represent any intent to preempt the state's decades-old authority to conduct certificate of public convenience and necessity proceedings that consider issues of need and prudence. How do you distinguish the prudence inquiry that was forbidden in Mississippi Power and Appalachian Power from what PUC did here? Because, as I said before, Mississippi Power involved a specific order from FERC making a determination on whether something was prudent or not. Here we don't have a specific order from FERC on siting. We have a specific order with respect to regional transmission planning, which, again, is a process. Siting is a substantive decision. All I'm asking, Your Honors, is to follow exactly what FERC has done. Your position is FERC gets to put together a plan, and it's up to the state whether to accept it or not? Is that what you understand? No, the purpose is to create a single regional transmission plan instead of having all these different plans from individual transmission providers. I see that my time is up, Your Honor. Yes. Will my colleagues have any questions for now? No, I just wanted to address Attleboro. Go ahead. Sure, you're on. Attleboro, that was a case that had to do with wholesale, sale of wholesale energy between two states. It's not this, and it didn't relate to interstate transmission lines itself, and the result of Attleboro was that Congress enacted the Federal Power Act to address that regulatory gap that was left by Attleboro, saying, well, the states can't regulate the prices between Rhode Island and Massachusetts. But it's not an interstate transmission line case. Okay, we'll have you back on rebuttal. Thank you. Okay, thank you very much. Your Honor, and may it please the Court, Matthew Price on behalf of Transverse Pennsylvania LLC. The regional grid operator, PJM, determined a new transmission line was needed because constraints on the interstate electric grid had caused significant regional disparities in wholesale electricity prices. When it came time to obtain state siting approval for the line, the Commission refused. When you say siting, what do you include in that word? To me, siting is about the local effects of transmission facilities linked to traditional state police powers over things like public health and safety and environmental effects. And if you look at Section 5776, that's the core of what that regulation is focused on. And I want to make clear that we also acknowledge states can sometimes assess need for local transmission projects, those that haven't been designed to support the efficiency and reliability of the regional grid, where there hasn't been any regional assessment by PJM through its FERC-approved tariff. And our brief points out on pages 35 and 36 of our brief, that's actually two-thirds of PJM transmission investment are these local transmission projects. With those projects, there can be an assessment of need by the state. But when it comes to regional projects that are affecting the interstate region and that are needed to address wholesale pricing disparities within that region, FERC makes the need determination, and the state can't override that determination. One of PUC's complaints is that, or the ALJ's findings, is that the congestion amount that TransSource believed was going on is actually not as bad. And in fact, it's reduced over time. Are you saying that the PUC is unable to consider that changed circumstance in evaluating whether to grant the permits? Well, a couple of answers to that, Your Honor. First is the legal answer, which is, yes, that is what I'm saying, because there's a process in PJM under its FERC-approved tariff for PJM to consider that very question. PJM annually revisits these projects and assesses whether congestion patterns have changed to determine whether there still is a need for the project, and if PJM, through that analysis, determines that congestion has been eliminated to such an extent that the line is no longer needed and has confidence in that judgment, it can cancel the project. So I'm talking about, can PUC take that fact into account and say the project should not proceed? No, because, again, PJM, through its FERC-approved tariff, is the one that makes the need determination. There's a process that PJM has under that tariff for assessing changed circumstances. And can a state authority like PUC, could they come in in the process of seeking the tariff and object or raise views about the mistake? Of course. Of course, Your Honor. And absolutely anyone, in fact, any individual, even the landowners in this case, can go to FERC and file a complaint and say, hey, PJM, your tariff is not just and reasonable. Your tariff is illegal. You're not applying your tariff according to its terms. The tariff needs to be changed. You've made factual errors. And FERC is a forum that can hear that. That didn't happen here, did it? It didn't happen here because, but, you know, we do provide examples in our brief of where that has happened. Where, in fact, in one case, it was TransSource that went to FERC to complain. In other cases, state commissions have routinely go to FERC to complain about various things. And if there are material disputes of fact, there's a hearing process with witnesses, cross-examination, all the usual, you know, due process protections. Your position, then, that if the PUC's view that the need for the congestion problem has decreased, that the place that that should have been brought up was in the tariff proceedings, not as a ground to deny the permit? Correct. They can't take that into their own hands and override the federal determination that there still is a need, despite the PUC's own view of what the facts are. But I also want to point out that when the record closed here, the ratio of benefits to cost was 3.64. And that's at pages 530 and 531 of the Joint Appendix, which is massively excess. That ratio, though, is derived from ignoring the reduction of the Pennsylvania cost? That's right, according to the FERC-approved tariff and the rules that FERC has adopted for that. And I'm happy to explain the logic of that for the Court. The logic is that the customers who are enjoying the low prices today are enjoying a windfall from prices that are effectively artificially low, that they don't have any entitlement to continue receiving, that result from an inefficiency on the grid, the inability of the grid to transmit electricity as freely as we'd like. So you shouldn't count the fact that they're going to be relieved of their windfall as a cost, or you'd never be able to build a project. There are always going to be winners and losers when you relieve congestion. The whole point is prices are high in one place and low in another. And when you try to equalize it to make sure that prices across an entire region are just and reasonable, the consequence is going to be that some people will pay more. But if you counted that as a cost, you'd never be able to build a project. How does the eminent domain process work here? The eminent domain process is, my understanding is that after, and I'm sure that my fellow counsel can correct me in a rebuttal if I get this wrong, but my understanding is that after siting approval is issued, the transmission developer can then go and seek eminent domain with respect to the right-of-way that's been approved by the commission. So it's a separate state process that happens in state court. And that's my understanding of how it works. I do want to point out that I think if you read a lot of the Ramekis briefs and the commission's brief to some degree as well, there's this notion that somehow we're sort of, by saying there's a need, we're deciding the eminent domain process. And that's not true, right? I mean, need is only one component of the factors that the Pennsylvania Commission is entitled to consider when deciding whether to grant siting approval. And, you know, it didn't decide the others in this case. I think as a follow-up to what Judge McKee is asking about, let's say hypothetically the panel were to affirm the district court. You still don't have a permit. So from a practical point of view, what happens? So I think what would happen is that, I mean, right now there's no stay, right? So the matter is back before the Pennsylvania Commission, and the Pennsylvania Commission would need to reconsider its order and reach the other prongs of the siting regulation, which it didn't decide. I see. But if we're evaluating those prongs, it finds reason to deny the permit, then it could reach that decision. It could certainly reach that decision if it decides that, you know, the environmental effects or the public health and safety issues are, I mean, we don't think that would be justified based on the record, but that's a matter for them to consider after an affirmance. Are there circumstances where a state agency like a PUC could reject an application based on its assessment of, quote, need? And if so, what need are they allowed to consider? Because your adversary says there are different needs being considered by different entities in the process. So maybe I should, if you give me a, I'll withdraw that question and start with this. What need is FERC considering, what need is the PUC considering, and can one consider the other? Do they have authority to consider each other's needs? So, yeah, so I referenced this a little bit earlier, but let me expand on it. FERC is considering regional need. It's considering regional reliability need, and it's considering regional efficiency need, when you have wholesale pricing disparities between different parts of the interstate region. That's what FERC is considering. When FERC has made no, there are many transmission lines that are not about either of those things. They're about solving a local problem that is limited to within the borders of a particular state. When you're dealing with that kind of line, FERC's regional planning process has nothing to say about it one way or the other, and the state in that situation is entitled to consider the need because it's looking, the universe of need considerations is limited to what's within the state. But when you have a regional line that is about regional reliability and regional efficiency, that's the situation in which the state cannot be overriding FERC's determination of need. Does that answer the question, Judge Schwartz? It does, thank you. Your adversaries were looking at the impact on the intrastate concerns and focused on that. Could this case be resolved only on dormant commerce clause economic protectionism grounds? Could it be? I mean, it could be in the sense that we think that we prevail on that ground as well, and I'm happy to talk about that and the reasons why. But we feel the preemption issue is really the more important in the scheme of the industry and providing clear guidance about what state commissions can and can't do, and so we would prefer if the court would affirm in our favor on both grounds rather than limiting itself to the dormant commerce clause. I did want to talk a little bit about Order 1000 and my fellow counsel's arguments on that. I think if you look at Order 1000, what it says is, yes, it respects a state role in regulating siting and construction because it doesn't require facility construction. It doesn't require a permit to be issued. Order 1000 does not do that, and we're not arguing that the state is required to issue a permit. The state can consider the aspects of siting that are legitimately within its scope. But what Order 1000 does say is the federal government can regulate planning. It can determine regional needs. And if you look at Order 1000, you know, paragraphs 107, 112, 42 to 43, 99, all of these talk about needs, 78 through 81. All of them talk about determination of regional need. And what the D.C. Circuit said in the South Carolina case is that that is something that FERC has authority to do because it has broad authority over transmission, and it also has exclusive authority over wholesale pricing. Are you asking us to hold that if FERC is acting its capacity of deciding a regional need to further the grid and regional transmission, by implication, doesn't that mean a state entity has to grant the permit? Not grant the permit, Your Honor, but recognize the need. And, again— What's the difference? If the need is recognized, doesn't the permit follow from that? No, because, Your Honor, again, there may be kind of incommensurate goods that the state can consider, like environmental considerations, public health and safety, and so forth, that that is still within legitimate scope of the state. So, from your point of view, it satisfies the need or justification is required. It might, by operation, it's a reasonable line. You can't question that. There's a need for it because of the interstate component. But a state still can look at, basically, its concerns about its community from an environmental standpoint. Correct, that's right. Do economic interests come into play in that regard? I understand that your argument is the PUC can't recalculate the cost-benefit need for the transmission line to determine that it thinks it's not reasonable and just under federal law, or under state law, obviously. But do economic interests inform the exercise of its traditional policing powers in any way? Well, certainly not with respect to the impact on wholesale pricing. No, I understand. Economic effects on the community, I think that would be a question of state law as to how far the state can reach. I think there are dormant commerce clause implications to that, because a state is not allowed to prevent the construction of an instrumentality of commerce in order to preserve local economic benefits. So I think those are the kind of category-relevant considerations that would need to be addressed. And frankly, I don't know how Pennsylvania views the scope of that inquiry. I also wanted to just point out that the lack of authority on their side of states actually doing what they've sought to do here is really striking. And the best they have is a single dissenting view of a FERC commissioner. And we cite both the Maryland decision involving this line, and also a prior decision of the Pennsylvania Commission itself in the trail case, where they both recognize that when there's been a regional need determination that's been made, the state needs to follow that determination and can't second-guess it. So in the two cases we found that this precise issue has come up before state commissions, they, including the commission here itself, have ruled in our favor. With respect to the Mississippi Power case, my opponent's attempt to distinguish that is that FERC had there issued a specific order. Well, of course, we have a specific order here, too. We have the 2008 FERC decision at J.A. 594, paragraph 67, which sets forth the specific methodology that FERC wants to use with respect to weighing the costs and benefits of eliminating regional wholesale price disparities. And then he also quotes this passage from Order 1000 about what needs to be built, where it needs to be built, and who needs to build it. And I want to just point out that they're really taking that quote really out of context. FERC's point there is that the rule is mandating a process, and then transmission providers like PJM need to apply the process to decide what needs to be built. And if you look at the actual quote in Order 1000 in paragraph 49, it is, and I'm quoting now, such planning may require public utility transmission providers in consultation with stakeholders to determine what needs to be built. The public utility transmission provider is PJM. It determines what needs to be built. It doesn't say states there. At best, states have a consultative role under this framework. And that is confirmed by the D.C. Circuit's case in the Mara, Maine, which is cited in the PUC brief at page 35. The D.C. Circuit there, writing about New England, ISO New England is the New England equivalent of PJM, says, quote, requiring that ISO New England, rather than the states, rather than the states, evaluate transmission needs and potential solutions is a reasonable implementation of Order 1000's regional planning process, which we upheld in South Carolina. That's at page 674 of that case. And so the process here for PJM is to apply the cost-benefit analysis using the method approved by FERC. PJM then applied that, approved this line, determined that it needed to be built, and the Pennsylvania Commission was not permitted to second-guess that based on a reweighing of wholesale price disparities and their regional impacts. If there are no further questions, thank you very much. I'm curious. How is the energy transmitted? Is it a large cable underground, above ground? It's above ground. It's basically large gantries, and then wires are strung on the gantries. Okay, I'm just curious. Yeah. All right, thank you very much. Thank you, counsel. Thank you, Your Honor. State commissions consider regional projects, not just in-state needs, but also regional. The Pennsylvania Public Utility Commission has that obligation under Section 2805, and in the past they have approved projects that were regional in scope when they were needed. The Commonwealth Court, in this case, pointed that out. Have they done that when the approval would disadvantage Pennsylvania consumers? The case I'm referring to, TRAIL, involved a reliability case, a reliability issue, not a market analysis, but it benefited both Pennsylvania and other states. Here, even PJM's own analysis now shows that this project is not needed. Why didn't PUC bring those concerns to FERC? What they're referring to is bringing a challenge to their methodology, but the methodology challenge, we don't have all the evidence. PUC can't make a decision. But the PUC did question the methodology that FERC used. They could question it, but they wouldn't know how it's going to apply until the evidence is presented, and that's why there's a fully litigated record before the PUC. You saw the extent of the record before the ALJ. There's nothing like that. That kind of challenge doesn't occur before FERC. But do PUC participate in that process? They could challenge the methodology. There's a number of different methodologies that one could use in terms of making a— Why didn't the PUC do that? Because they don't know how it's going to apply until all the evidence is in. But they straight up challenged this failure to consider the increased price on others instead of the decreased price on only those who benefited. It was like they were concerned about that methodology. I don't think you need any evidence to verify how that's going to impact it. It was said more than once in the opinions. Keep in mind that congestion is often fluctuating. I think that's one of the issues, that even in this case, congestion has changed over time. So they can't make an analysis, and they can't go to FERC and make a determination or a challenge based on evidence that is not before them. This would also undermine their role. I'm sorry. What is this evidence you're talking about? The evidence that they receive before the PUC about increases. Right, but back to Judge Worthen's question. The ALJ's fundamental problem seems to be the math, right, that they didn't back out the costs to the Pennsylvania rate payers. But that—there's no evidentiary development there. That's a legal question. No, that's—well, it's both, because they don't know how the— again, they don't know how the methodology is going to apply until they take in evidence about the costs and the benefits. Benefits to whom? Region? Yes, regional benefits. That's something, again, that the PUC can take into consideration when they're making analysis, that there are benefits. In fact, look at the Federal Power Act. They recognize that states can make a determination based on not just their needs but outside, because in the Federal Power Act, the limited backstop siting authority says that one of the conditions for FERC to step in with the backstop siting authority is if there is no authority for the state to take into account interregional or interstate. But that backstop authority isn't applicable in this case. It's not, but I think it shows what Congress understands siting to mean, and siting means taking into account the needs. I see my time is up again, Your Honor. Do my colleagues have anything else? Okay, thank you, Counsel. Thank you, Your Honor. The Court appreciates the helpful arguments and the briefing we've received. We would like a copy of the transcript of today's argument, so I'll ask the parties to split the cost of that, and you can speak with the court crier about the arrangements.